# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| GEORGIA SECURITY SOLUTIONS, LLC f/k/a CONTROLBYNET, LLC, <br><br> Plaintiff, <br><br> v. <br><br> NEWCBN, LLC, SECURITY SERVICES ACQUISITION SUB CORP., and SECURITY SERVICES HOLDINGS LLC, <br><br> Defendants. | C.A. No. 2025-0798-JTL |

## MEMORANDUM OPINION REGARDING MOTION TO DISMISS

Date Submitted: April 7, 2026
Date Decided: August 3, 2026

Timothy R. Dudderar, Ryan M. Ellingson, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorneys for Plaintiff Georgia Security Solutions, LLC f/k/a ControlByNet, LLC.*

Christopher B. Chuff, Tyler R. Wilson, TROUTMAN PEPPER LOCKE LLP, Wilmington, Delaware; *Attorneys for Defendants NewCBN, LLC, Security Services Acquisition Sub Corp., and Security Services Holdings LLC.*

**LASTER, V.C.**

An electronic security solutions company (the "Seller") sold its video monitoring business to a security services provider (the "Buyer") under a membership interest purchase agreement. The agreement included a contingent right to an earnout payment of up to $6 million. The earnout payment scaled with recurring revenue measured over a specified period.

The agreement included several covenants restricting the Buyer's actions during the earnout period. Those covenants covered employee retention and goodwill. Another covenant prohibited the Buyer from taking action with the intent or primary effect of thwarting the earnout. The agreement also prescribed a dispute resolution mechanism for the earnout calculation involving an independent accountant.

After the transaction closed, the Buyer sidelined the Seller's founder, who maintained most of the key customer relationships. The Buyer also reassigned key personnel to non-sales roles, put novice accountants in charge of the company's accounting, and hired new employees with no industry experience. Those changes led to widespread problems.

At the end of the earnout period, the Buyer reported recurring revenue that fell just short of the threshold for an earnout payment. The Seller asked for documents to verify the recurring revenue calculation. The Buyer produced some documents but objected to others. For several months, the parties tried to resolve their disputes. Eventually, the Seller sued.

The Seller claims that the Buyer breached express and implied terms of the agreement. The Seller alleges that the Buyer computed recurring revenue incorrectly, withheld documents improperly, and breached earnout covenants.

The Buyer moved to dismiss the complaint under Rules 12(b)(1) and 12(b)(3). The Buyer claims the independent accountant mechanism functions as an arbitration provision and requires that the independent accountant resolve the Seller's claims. That mechanism instead calls for an expert determination under which the accountant decides issues within its technical remit. The court must answer foundational legal questions and any claims falling outside the accountant's purview. The Seller's disputes are mainly for this court to decide. Once the court has resolved them, the accountant can apply those rulings to calculate recurring revenue and the amount of any earnout payment. On that basis, the Rule 12(b)(1) and (b)(3) motions are denied.

The Buyer also moved to dismiss the Seller's claims under Rule 12(b)(6). That motion is granted as to the implied covenant claim and certain breach of contract theories. The motion is otherwise denied.

## I.    FACTUAL BACKGROUND

The facts are drawn from the complaint and the documents it incorporates by reference.[1] At this procedural stage, the court must credit the complaint's well-pled allegations and draw all reasonable inferences in the plaintiff's favor.

---

[1] Citations in the form "Compl. ¶ ___" refer to paragraphs of the complaint. Dkt. 1. Citations in the form "Ex. ___ at ___" refer to exhibits to the complaint. *Id.*

## A.     The Sale

The Seller is Georgia Security Solutions LLC, which operated a security services and remote video monitoring business under the name ControlByNet. Ryan Strange was its founder, managing member, and President.

The Buyer is Security Services Holdings LLC. It provides customized security solutions nationwide.

The Buyer agreed to acquire the ControlByNet business. To facilitate the sale, the Seller contributed assets and interests to a newly formed entity, NewCBN, LLC (the "Company"). Under a membership interest purchase agreement dated August 15, 2022 (the "Agreement"), The Seller sold membership interests in the Company to the Buyer.[2] In return, the Seller received around $13 million at closing, rollover equity in the Buyer valued at around $2 million, and a contingent right to an earnout payment of up to $6 million.

---

Citations in the form "OB at ___" refer to the Buyer's Opening Brief. Dkt. 9. Citations in the form "AB at ___" refer to the Seller's Answering Brief. Dkt. 16. Citations in the form "RB at ___" refer to the Buyer's Reply Brief. Dkt. 20. I do not believe that this decision addresses any issues *sua sponte*. It does strive to present a thorough discussion of the legal issues the parties raised, and in doing so both uses different language and cites some different authorities than the parties. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.").

[2] *See* Ex. 1 (cited as "MIPA").

The Agreement tied the earnout to "Recurring Revenue," defined as the Company's revenue during the "trailing twelve (12) month period through December 31, 2023," determined in accordance with GAAP, and subject to specific exclusions and anti-diversion language. The "Earnout Period" ran from the first business day after closing to December 31, 2023. Because closing took place on August 15, 2022, the Earnout Period was longer than the trailing-twelve-month period used in the definition of Recurring Revenue (the "Recurring Revenue Period").

The Agreement specified that Recurring Revenue needed to exceed $2.6 million to trigger an earnout payment (the "Earnout Threshold"). The Agreement identified additional Recurring Revenue targets that could increase the amount of the payment.[3] To receive the maximum earnout payment of $6 million, Recurring Revenue had to exceed $4.55 million. When the parties executed the Agreement, Recurring Revenue was projected to exceed $3.5 million and yield an earnout of $4.4 million.

## B. The Covenants

The Agreement included covenants that constrained the Buyer during the Earnout Period.

First, the Buyer committed to "refrain from taking any action which is intended to prevent, or, taking into account the best interests of Buyer and its equity

---

[3] *See id.* at § 2.6(b).

4

holders, the primary effect of which is to prevent, the realization of the achievement of the Earnout Payment" (the "Negative Covenant").[4]

Second, "without limiting the business judgment of the Buyer, but acting in good faith," the Buyer committed to "cause the Company to use its commercially reasonable best efforts" to "retain and keep available" its employees' services, "preserve the goodwill" with customers, suppliers, and other business relations, and "maintain an appropriate level of working capital" for the business (the "Reasonable Efforts Covenant").[5]

The parties agreed that Strange would remain as President under a five-year employment agreement. Strange was personally responsible for 80% of the Company's customer relationships, which were key to Recurring Revenue. The Buyer assured Strange that he would have executive control and full access to financial data.

## C.    The Buyer's Conduct During The Earnout Period

Shortly after closing, the Buyer's CEO lowered the Company's annual recurring revenue goal from $3 million to $2.6 million—the same level as the Earnout Threshold. When the Buyer's CEO made this change, the Company expected to generate at least $3 million in recurring revenue and $2.6 million was already committed under customer contracts.

---

[4] *Id.*

[5] *Id.*

Within three months of closing, the Buyer removed Strange from his role as President and gave him the title of "Founder." As part of the change, the Buyer eliminated Strange's authority over sales, marketing, operations, and technology. The Buyer also forced Strange to hand off his customer relationships to less experienced staff. Strange asked the Buyer for a gradual transition, but the Buyer refused.

Next, the Buyer hired a new General Manager and a new Vice President of Sales. The Buyer also brought on an outside business consultant. None of them had industry experience. The Vice President of Sales failed to produce any sales in 2023 and was terminated just after the Earnout Period ended.

In first quarter 2023, the Buyer delayed or cancelled new projects that the Company had planned to launch. The Buyer also assigned novice accountants to manage the Company's accounting function. The Company soon experienced accounting and billing problems. All of the Company's regular customers received blank invoices. The Buyer forgave some outstanding amounts and never billed for others. Some customers relationships ended. The Buyer also deferred revenue for no legitimate business reason from the second half of 2023 (within the Earnout Period) to January 2024 (after the Earnout Period).

In mid-2023, the Buyer reassigned, terminated, or underpaid key customer support personnel. Those practices degraded the Company's customer service and caused some customers to go elsewhere.

In fall 2023, the Buyer asked Strange to resign. When he declined, the Buyer shifted Strange to a consulting role and told employees not to talk to him.

After the Earnout Period ended, the Buyer's conduct changed. The Buyer renewed its commitment to customer support and pursued commercial contracts.

## D.    The Dispute Resolution Procedure

The Agreement required that the Buyer send the Seller a written notice within sixty days after the end of the Earnout Period (the "Notice of Achievement"). The notice had to specify the amount of Recurring Revenue and the amount of any earnout payment.[6] After receiving the Notice of Achievement, the Seller could ask for "all records and work papers to the extent used in computing the Earnout Payment (or to the extent reasonably necessary to verify any payment owed . . . if any)" (the "Information Right").[7]

If the Seller wanted to dispute the Recurring Revenue calculation or the amount of the earnout payment, then the Seller had to deliver a written notice to the Buyer identifying all points of disagreement (the "Dispute Notice").[8] The Agreement defined each point of disagreement as an "Item of Dispute."[9]

---

[6] *Id.* § 2.6(c).

[7] *Id.* §§ 2.6(d)–(e).

[8] *Id.* § 2.6(f).

[9] *Id.*

The parties had ninety days to try to resolve the Items of Dispute. After ninety days, the Agreement called for the parties to submit open Items of Dispute to an independent accountant (the "Independent Accountant Procedure").[10]

The Agreement charged the independent accountant with resolving each Item of Dispute. The resolution could not fall outside the range created by the parties' submissions (the "Collar"). The Agreement described the Independent Accountant Procedure as the parties' "sole recourse in the event of a dispute in respect of [the earnout]" (the "Sole Recourse Clause").[11] The independent accountant's determination was "deemed to be an arbitration award."[12]

## E. The Parties' Dispute

On February 28, 2024, the Buyer sent a Notice of Achievement to the Seller. The notice reported Recurring Revenue of $2,436,639 and an earnout payment of $0. Based on the definition of Recurring Revenue, the Buyer only included the preceding twelve months of revenue in the calculation. The Buyer excluded revenue generated between closing and the start of 2023.

On March 20, 2024, the Seller sent the Buyer a Dispute Notice. The Seller also exercised its Information Right. On April 5, 2024, the Buyer agreed to produce a

---

[10] *Id.* § 2.6(h).

[11] *Id.*

[12] *Id.*

limited set of documents but objected to providing others. The Seller insisted on its right to the documents it had requested.

On May 28, 2024, the Buyer produced documents from a sample of eleven customer accounts. Based on these documents, the Seller identified at least $215,000 in Recurring Revenue that the Buyer failed to count.

On June 25, 2024, the Seller invoked the Independent Accountant Procedure. From July through October 2024, the parties discussed their disputes. Ultimately, the Buyer offered an upward adjustment to Recurring Revenue of $34,136. The revised figure of $2,470,775 still fell below the Earnout Threshold.

## F.      This Litigation

On July 10, 2025, the Seller filed suit. The complaint contains three counts:

- Count I asserts that the Buyer calculated the Earnout Payment incorrectly and failed to comply with the Information Right. The Seller seeks a decree of specific performance enforcing those provisions.

- Count II asserts that the Buyer breached the implied covenant of good faith and fair dealing.

- Count III seeks a declaratory judgment that the Buyer failed to comply with the Information Right, breached the Reasonable Efforts Covenant, failed to calculate Recurring Revenue properly, and failed to satisfy its payment obligations.

The Buyer moved to dismiss the complaint for lack of subject matter jurisdiction under Rule 12(b)(1), improper venue under Rule 12(b)(3), and failure to state a claim on which relief can be granted under Rule 12(b)(6).

## II.      JURISDICTION AND VENUE

The Buyer argues for dismissal either for lack of subject matter jurisdiction under Rule 12(b)(1) or improper venue under Rule 12(b)(3). Those motions present

three distinct questions: whether this court possesses subject matter jurisdiction, whether the Independent Accountant Procedure calls for arbitration or expert determination, and what is the scope of the independent accountant's remit.

## A. Subject Matter Jurisdiction

The Buyer seeks dismissal under Rule 12(b)(1) on the theory that the Independent Accountant Procedure calls for arbitration and that this court therefore lacks subject matter jurisdiction over the Seller's claims. Parties technically cannot establish or foreclose subject matter jurisdiction through private ordering.[13]

Count I asserts an ongoing failure to honor the Information Right and comply with the Independent Accountant Procedure and seeks specific performance as a remedy. That claim supports the existence of equitable jurisdiction, and the court can adjudicate the related legal claims under the clean-up doctrine.

## B. Does The Independent Accountant Procedure Call For Arbitration Or Expert Determination?

The parties disagree over whether the Independent Accountant Procedure calls for arbitration or expert determination. The Buyer argues that the procedure calls for arbitration and moves for dismissal under Rule 12(b)(3) in favor of that private venue.

---

[13] *Kroll v. City of Wilm.*, 2023 WL 6012795, at *14 (Del. Ch. Sept. 15, 2023) ("Subject matter jurisdiction concerns this court's powers, not the parties' rights. Therefore, parties may not waive the existence or non-existence of subject matter jurisdiction.").

10

An arbitration provision does not deprive a court of subject matter jurisdiction; it is a special type of forum-selection clause. Rule 12(b)(3) therefore supplies the preferred procedural vehicle for invoking an arbitration provision at the outset of a case, although Delaware courts have also analyzed the issue under Rule 12(b)(1).[14] Because the Buyer invoked the procedure at the outset, the court analyzes the request through Rule 12(b)(3).[15] The procedural label does not change the substance of the inquiry. Principles of contract law dictate the result.[16]

When interpreting a contract, "the role of a court is to effectuate the parties' intent."[17] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole

---

[14] *See Gandhi-Kapoor v. Hone Cap. LLC*, 307 A.3d 328, 343–45 (Del. Ch. 2023); *see also id.* at 345 ("Rule 12(b)(1) can be used to ask a court to abstain from exercising the subject matter jurisdiction that it possesses, and the presence of an arbitration provision or forum selection clause provides a generally persuasive reason for abstention.").

[15] *Id.* at 343 (explaining that because Rule 12(b)(3) can only be raised at the outset of the case, Delaware courts have embraced Rule 12(b)(1) motions to enforce the parties' bargain to litigate elsewhere later in the case).

[16]*Id.* at 344 ("Properly understood, an arbitration provision does not deprive a court of subject matter jurisdiction. An arbitration provision is a special type of forum selection clause. By agreeing to arbitrate, the parties commit contractually to litigate their dispute in a private forum. A court can—and generally will—enforce the arbitration agreement, but that outcome flows from principles of contract law, not the absence of subject matter jurisdiction.").

[17] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

and giving effect to all its provisions."[18] "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[19] "Contract language is not ambiguous merely because the parties dispute what it means."[20] "To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning."[21] "Delaware courts will not destroy or twist [contract] language under the guise of construing it."[22] "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[23]

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."[24] "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the

---

[18] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (citations omitted).

[19] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (citations omitted).

[20] *Alta Berkeley*, 41 A.3d at 385; *accord Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) ("The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous." (internal quotation marks omitted)).

[21] *Alta Berkeley*, 41 A.3d at 385; *see Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

[22] *Rhone-Poulenc*, 616 A.2d at 1195.

[23] *City Inv. Co. Liquid. Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[24] *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

entire agreement where such inference runs counter to the agreement's overall scheme or plan."[25] "[A] court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument."[26] The Delaware Supreme Court has also instructed that "[t]he basic business relationship between parties must be understood to give sensible life to any contract."[27] A reasonable reading therefore must be "situated in the commercial context between the parties."[28]

The Buyer and Seller disagree on two points: (1) whether the Independent Accountant Procedure provides for arbitration or expert determination and (2) whether the disputes at issue in this litigation are reserved for the independent accountant. On the first issue, the Buyer argues the Independent Accountant Procedure calls for arbitration. The Seller says it calls for expert determination. If the Buyer is right, then doctrines of substantive and procedural arbitrability kick in.[29] If the Seller is right, the body of law governing arbitration is irrelevant.[30]

---

[25] *Id.*

[26] *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

[27] *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 927 (Del. 2017).

[28] *Id.* at 926–27.

[29] *Penton Bus. Media Hldgs., LLC v. Informa PLC*, 252 A.3d 445, 454 (Del. Ch. 2018).

[30] *Id.*

Because arbitration brings with it unique legal doctrines, a court must determine at the outset whether the parties have opted for arbitration. To answer that question, the Delaware Supreme Court has adopted an analytical framework proposed by the New York City Bar Committee on International Commercial Disputes.[31] The test turns primarily on the degree of authority delegated to the decision-maker.[32]

Parties can create dispute resolution mechanisms that "fall along a spectrum."[33] Arbitration sits at one end; expert determination sits at the other. "A provision more likely calls for an arbitration if it include[s] procedural rules affording each side the opportunity to present their case and empowers the decisionmaker" with the "authority to decide all legal and factual issues necessary to resolve the matter, analogous to the powers of a judge in a judicial proceeding."[34] "It more likely calls for an expert determination when it contemplates a more informal procedure

---

[31] *Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610, 618 (Del. 2023) (citing N.Y.C. Bar Comm. on Int'l Commercial Arbitration, *Purchase Price Adjustment Clauses and Expert Determinations: Legal Issues, Practical Problems and Suggested Improvements* (2013)).

[32] *ArchKey Intermediate Hldgs. Inc. v. Mona*, 302 A.3d 975, 994 (Del. Ch. 2023).

[33] *Id.* at 989.

[34] *Monica v. Delta Data Software, Inc.*, 2026 WL 370756, at *13 (citations omitted).

and empowers the decisionmaker to determine only a disputed factual issue that requires specialized knowledge" and "usually concern[s] an issue of valuation."[35]

Parties can also craft mechanisms that fall in between. A common dispute resolution mechanism in transaction agreements is an accountant true-up.[36] It involves relatively standard steps:

- The buyer has a defined period of time to prepare a statement to be used to adjust an economic term, like the purchase price.

- The buyer sends a proposed statement to the seller.

- The seller has a defined period to review the statement and raise objections.

- If the seller does not object, then the statement is used to adjust the economic term.

- If the seller objects, then the seller submits a written response detailing its objections.

- The parties engage in negotiations for a set period.

- The parties submit any remaining disputes to an independent accountant.

- The parties give the independent accountant opening and rebuttal submissions with supporting documents.

- The accountant resolves the disputes.

- The accountant's determination is final and binding.[37]

---

[35] *Id.*

[36] *ArchKey*, 302 A.3d at 989.

[37] A. Vincent Biemans & Gerald M. Hansen, *M&A Disputes: A Professional Guide to Accounting Arbitrations* 19–20 (2017) (hereinafter *M&A Disputes*). *M&A Disputes* is a monograph about how Accountant True-Up Mechanisms work. Although the book makes clear that an Accountant True-Up Mechanism is its own

In general, an accountant true-up is "a beefed-up expert determination, not a slimmed down legal arbitration."[38] That characterization typically remains apt even when a provision uses the word "arbitration" or calls the accountant an "arbitrator."[39] An agreement could designate an accountant to serve as an arbitrator if it delegated judge-like authority to decide factual and legal issues, for example, by specifying an arbitral organization and its governing rules. Conversely, isolated references to an "arbitrator" or "arbitration" will not expand an expert's narrow charge.[40]

The Agreement tracks the steps in an accountant true-up. The Buyer must submit a Notice of Achievement.[41] The Seller has sixty days to respond with a Dispute

---

unique animal, the authors refer to the mechanism as an "accountant arbitration." That usage is confusing, and this decision eschews it.

[38] *ArchKey*, 302 A.3d at 995 (stating that to shift an accountant true-up mechanism into the arbitral side of the spectrum, "the provision needs to do more" than make a stray reference to arbitration, such as by "specifying a sponsoring arbitral organization and designating a set of arbitral rules.").

[39] *See id.* at 992 ("[D]rafters sometimes complicate matters by using a term like 'arbitrator' or 'arbitration' rather than 'expert' or 'expert determination. Regardless of what language the provision uses, the dispute resolution process before the independent accountant and the issues at play are typically the same." (cleaned up)); *see also id.* at 993 ("Under the authority test, using the word 'arbitrator' or 'arbitration' provides a signal about what the parties intended, but it is not dispositive.").

[40] *Id.*

[41] *See* MIPA § 2.6(c).

Notice.[42] The parties must negotiate over any Items of Dispute.[43] Any unresolved items go to the independent accountant, whose determination is "final, conclusive and binding."[44]

Several other signals point to an expert determination. The first is choosing an accountant as the decisionmaker. "That choice strongly suggests an intent to rely on the independent accountant's subject matter expertise, which is consistent with an accountant true-up mechanism and inconsistent with legal arbitration."[45] The second is the absence of any reference to an arbitration organization or procedural rules, which are defining characteristics of arbitration provisions.[46] Instead, the Agreement opts for an accounting firm and uses the Collar to place strict limits on the firm's

---

[42] *See id.* § 2.6(f).

[43] *See id.* § 2.6(g).

[44] *Id.* § 2.6(h).

[45] *ArchKey*, 302 A.3d at 996 (cleaned up).

[46] *Ray Beyond Corp. v. Trimaran Fund Mgmt., L.L.C.*, 2019 WL 366614, at *7 (Del. Ch. Jan. 29, 2019) ("Arbitration provisions typically include procedural rules affording each party the opportunity to present its case; indeed, this is viewed as a 'defining characteristic' of arbitration provisions." (citation omitted)).

determinations.[47] A final signal is that the disputes are to be resolved without a hearing.[48]

The statement that the accountant's decision is enforceable as an arbitration award points in the opposite direction and deserves weight. But "labels are not dispositive,"[49] and an arbitration label does not change what the accountant was empowered to decide. Nothing else in the Independent Accountant Procedure suggests arbitration.[50] The Buyer itself acknowledges the provision "is more akin to an expert determination than an arbitration provision."[51] Reading the provision as a whole, the Independent Accountant Procedure calls for an expert determination.

---

[47] *See* MIPA § 2.6(h) (establishing the Collar); *id.* § 2.6(b)(ii) (setting a $6 million ceiling for the Earnout Payment).

[48] *ArchKey*, 302 A.3d at 996 ("A legal arbitration generally involves one or more hearings at which evidence is presented . . . . An expert determination need not involve a hearing.").

[49] *LG Land, LLC v. Dreamers Finders Hldgs., LLC*, 2026 WL 939223, at *5 (Apr. 7, 2026) (quoting *Paul v. Rockpoint Gp., LLC*, 2024 WL 89643, at *10 (Del. Ch. Jan. 9, 2024)).

[50] *See Conlon v. CGI Mfg. Hldgs. LLC*, 2026 WL 1831266, at *9 (Del. Super. June 15, 2026) (holding that a "provision that states that the decision is enforceable as an arbitration award" does not transform an expert determination provision into an arbitration provision without additional signals that the parties clearly intended to do so).

[51] OB at 21.

18

## C. What Disputes Does The Independent Accountant Procedure Cover?

Because the Independent Accountant Procedure is an expert determination, the court must interpret the Agreement to determine what authority the independent accountant possesses.[52] The parties disagree over:

- Whether the Buyer breached the Negative Covenant;

- Whether the Buyer breached the Reasonable Efforts Covenant;

- Whether the Buyer breached the Information Right;

- Whether the correct measurement period is the Recurring Revenue Period or the Earnout Period; and

- Whether the Buyer included all qualifying income in its Recurring Revenue calculation.

The Agreement calls for the independent accountant to address unresolved Items of Dispute.[53] It defines those items as "items of disagreement related to the Earnout Payment."[54] The Earnout Payment turns on Recurring Revenue.[55] The Collar limits the independent accountant's resolution of Items of Dispute.[56]

Under the plain language of those provisions, the independent accountant can address "items of disagreement related to the Earnout Payment." That phrase might

---

[52] *Terrell*, 297 A.3d at 617.

[53] *See* MIPA § 2.6(h).

[54] *See id.* § 2.6(f).

[55] *See id.* § 2.6(b).

[56] *Id.* §2.6(h) (providing that determination "shall not be less than the lowest or greater than the greatest amount . . . submitted by the Parties[.]").

19

initially seem broad, but it is anchored to the Earnout Payment. That payment in turn involves a limited calculation based on Recurring Revenue. The independent accountant can determine how much Recurring Revenue there was, including resolving disputes over GAAP and deciding whether particular revenue was properly excluded, deferred, diverted, or forgiven.

The independent accountant can also interpret terms closely tied to the calculation task, but its authority goes no further.[57] A court must decide what measuring period the Agreement requires and whether the Buyer complied with the Information Right or breached the earnout covenants. Once the court has made those determinations, the independent accountant can resolve the technical accounting issues and calculate Recurring Revenue.

---

[57] *Paul*, 2024 WL 89643, at *11–12 (explaining that the accounting expert's grant of authority did not encompass major legal issues like contract interpretation); *ArchKey*, 302 A.3d at 997–98 (holding that accountants may interpret terms closely tied to their calculation task, but it does not make accountants plenary adjudicators of covenant breaches or equitable remedies); *AM Buyer, LLC v. Argosy Inv. P'rs IV, L.P.*, 2024 WL 4024980, at *12 (Del. Super. Sept. 3, 2024), *aff'd*, 345 A.3d 958 (Del. July 23, 2025) (TABLE) (holding that an accountant could resolve a books-and-records issue as an input to determining the earnout amount but emphasized that the remedy was for the specific purpose of resolving the earnout dispute and "not for any legal purpose."); *cf. Belknap Hldgs., LLC v. Midwest Prototyping, LLC*, 2024 WL 4441958, at *6 (Del. Super. Oct. 8, 2024) ("The more closely related the term or provision is to the expert's area of expertise, the more likely it is that an expert can interpret the term without judicial assistance."(citation omitted)); *see also Knight Broadband LLC v. Knight*, 2022 WL 1788855, at *16–17 (Del. Super. June 2, 2022) (distinguishing between a dispute that implicated contract interpretation as properly before the court versus one that hinged on an accounting issue and was reserved for the accounting expert).

Based on the Sole Recourse Clause, the Buyer argues any dispute connected to the earnout must go to the independent accountant, including the Seller's breach of contract claims. The Sole Recourse Clause provides that "the Parties' sole recourse in the event of a dispute in respect of [the earnout], including any failure to pay the Earnout Payment, shall be limited to the provisions of [the earnout]."[58]

Well-settled principles of contract interpretation require a court to "read the instrument as a whole" and "reconcile all provisions of the instrument."[59] The Sole Recourse Clause does not say that the parties' sole recourse is to the Independent Accountant Procedure. Instead, it limits the parties' recourse to the rights and remedies available in the sections of the Agreement governing the earnout. For example, the earnout section contains a provision that exculpates the Buyer and its affiliates for certain types of damages.[60] The Buyer's reading of the Sole Recourse Clause fails to give effect to that provision.[61] The Collar already constrains the independent accountant's determinations, so the Exculpation Provision would have no work to do because the accountant could not award damages anyway.

---

[58] *See* MIPA § 2.6(h).

[59] *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

[60] *See* MIPA § 2.6(k).

[61] *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

The Information Right and the Earnout Covenants provide additional examples of provisions beyond the independent accountant's ken. Routing disputes over those provisions to the independent accountant would render them toothless. The independent accountant cannot order specific performance to enforce the Information Right or craft a damages remedy for covenant breaches. The Agreement contemplates that a court will resolve those disputes.[62]

The Buyer cites *Stillfront* to support its reading of the Sole Recourse Clause.[63] There, a merger agreement referred any disputes over the earnout amount to an independent accountant who was referred to as an arbitrator.[64] When the buyer refused to pay anything, the seller sued. In the litigation, both sides operated "under

---

[62] On specific performance and equitable remedies, s*ee, e.g.*, MIPA § 7.16(d) (stating that if "any of the Parties breaches . . . any covenant in this Agreement . . . for which the Parties hereto acknowledge that money damages may be an inadequate remedy . . . the non-breaching party shall have the right and remedy to seek . . . specific performance of the Covenants or injunctive relief against any act which would violate the Covenants . . ."); *see also id.* § 7.12 (stating that "the Parties shall each have and retain all . . . rights and remedies . . . including, without limitation, any actions for specific performance and/or injunctive relief or other equitable relief to enforce or prevent any violations of the provisions of this Agreement."). On forum and venue, *see, e.g.*, *id.* §§ 7.16(a)–(b) (providing exclusive jurisdiction to the Delaware Court of Chancery for "any action or proceeding arising out of or relating to this Agreement . . ." and a waiver of objection to venue); *id.* § 7.16(e) (stating that the "Parties intend to . . . confer jurisdiction to enforce the Covenants upon the courts of any jurisdiction within the geographical scope of such Covenants (and not just the courts located in Delaware)" provided that "the enforcement of any breach . . . shall take place in the jurisdiction where such breach . . . took place.").

[63] *Fortis Advisors LLC v. Stillfront Midco AB*, — A.3d —, 2026 WL 406073 (Del. Feb. 13, 2026).

[64] *Id.* at *2–3.

the assumption that [the provision] was an arbitration provision and not one calling for an expert determination."[65] The Court of Chancery sent all of the parties' claims to the independent accountant. On appeal, the seller changed course and argued that the dispute resolution provision "call[ed] for a narrow accounting-based expert determination."[66] The Delaware Supreme Court held the seller to the arbitration-based arguments it made to the Court of Chancery and affirmed.[67]

In this case, the Seller has argued from the outset that the Independent Accountant Procedure calls for an expert determination, and the Buyer has come close to conceding the point.[68] Nothing like *Stillfront* happened in this case.

*Stillfront* also turned on particular contract language that is absent here. The merger agreement provided that if the buyer breached the earnout covenants by acting in bad faith to reduce the earnout, then the seller would receive the maximum earnout amount.[69] The Delaware Supreme Court held that because the accountant was tasked with calculating the earnout amount, it made sense for the accountant to

---

[65] *Id.* at *5–6.

[66] *Id.* at *5.

[67] *Id.* at *6 ("Fortis was emphatic that the parties agreed to submit the earnout dispute to arbitration. At oral argument on Stillfront's motion to compel arbitration in the Court of Chancery, Fortis's counsel repeatedly referred to § 2.14 as an arbitration provision . . .").

[68] OB at 21 ("[W]hile Section 2.6 outlines a provision that is more akin to an expert determination than an arbitration provision . . .").

[69] *Stillfront*, 2026 WL 406073, at *3.

act as arbitrator and calculate the remedy for a bad faith breach.[70] Whether that argument would have carried the day without the seller's concession is an open question. In any event, the Agreement does not contain anything resembling that remedial mechanism. The Agreement does cap the Earnout Payment, but does not link the capped amount to a covenant breach.[71] The Agreement also does not specify a remedy for breach of the Information Right. A court must address those issues.[72]

In terms of the parties' disputes, the court must decide whether the Buyer breached the Reasonable Efforts Covenant or the Negative Covenant. The court must decide whether the Buyer breached the Information Right. The court must decide whether the correct measurement period was the Recurring Revenue Period or the Earnout Period. Once those issues are resolved, the independent accountant can determine whether the Buyer included all qualifying income in the Recurring Revenue calculation. The motion to send the Seller's claims to the independent accountant is denied.

## III.  RULE 12(B)(6)

The Buyer has separately moved to dismiss each of the Seller's claims under Rule 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests whether the complaint's

---

[70] *Id.* at *9 ("In both cases, the Arbitrator is determining the earnout amount to which Fortis is *actually* entitled.").

[71] *See* MIPA § 2.6(b)(ii) (setting $6 million ceiling for the Earnout Payment).

[72] *See id.* § 7.16(e).

allegations state a claim on which relief can be granted. When considering a Rule 12(b)(6) motion, "a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim, [and] draw all reasonable inferences in favor of the plaintiff."[73] The court should "deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[74] Delaware's "governing 'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'"[75]

## A. Counts I and III: Breach Of Contract

In Counts I and III, the Seller asserts claims based on the Agreement's express provisions. The theory based on a failure to provide unrequested quarterly financial statements falls short, as does the theory that Recurring Revenue should include the entire Earnout Period. The theories based on the Information Right, the Earnout Covenants, and the omission of qualifying revenue state claims. The independent accountant, however, must determine Recurring Revenue before the court can adjudicate the corresponding payment obligation.

---

[73] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[74] *Id.*

[75] *Id.* at 537 n.13.

### 1. The Failure To Provide Quarterly Financial Statements

The Seller first asserts the Buyer breached the Agreement by failing to provide contemporaneous quarterly financial statements during the Earnout Period. The Buyer points out that the Agreement only obligates the Buyer to provide them "if requested by Seller"[76] and asserts that the Seller never asked for them. The Seller does not argue otherwise. That claim for breach of the Agreement does not survive pleading-stage review.

### 2. The Failure To Comply With The Information Right

The Seller contends that the Buyer failed to fulfill its obligations under the Information Right. That provision entitles the Seller to two categories of information upon written request. The first is "all records and work papers to the extent used in computing the Earnout Payment" ("Computation Information").[77] The second is all records and work papers "to the extent reasonably necessary to verify any payment owed. . ." ("Verification Information").[78] The first category consists of the financial information the Buyer actually used to compute the Earnout Payment. The second category consists of information reasonably necessary to check the Buyer's work.

The Seller asked for eleven categories of documents, comprising:

- Category 1: Monthly billing summaries for all recurring services related to the complete Earnout Period, including customer name, amount, and total.

---

[76] MIPA § 2.6(d).

[77] *Id.* § 2.6(e).

[78] *Id.*

- Category 2: Quarter billing summaries for all recurring services related to the complete Earnout Period, including customer name, amount, and total.

- Category 3: Any recurring service invoices billed after the 1st of each month during 2023, including date of installation invoice.

- Category 4: All emails, invoices, and other documents related to the forgiveness of any customer invoices billed in 2023.

- Category 5: All emails, invoices, and other documents related to customer cancellations, including start date and last invoice, of customers who had not fulfilled one full year of any recurring service. This includes any forgiven invoices after cancellation.

- Category 6: All emails, salesforce reports related to accepted estimates, and invoices for when any 2023 estimate was accepted versus when the first monthly revenue invoice was billed.

- Category 7: Sales report for any closed estimates for David DiTirro, the VP of Sales for the division in 2023.

- Category 8: Sales report for all monthly recurring service related to the Earnout (managed video, remote video guard) from Protos sales employees that did not work directly for NewCBN LLC (including Protos Security, Security Resources, Mulligan Security, Off-Duty Services, Blue Star Security, Squad Security, MG Security, and any other security company in the Security Services portfolio) in 2023.

- Category 9: All emails, invoices, receipts, and any other documentation related to any third party remote guard services for 2023, (LiveView, RAD, or any others). Reporting includes any entity in the Security Services portfolio listed above that sold or services any recurring service in the video or remote guarding space.

- Category 10: 2023 sales/commission packages for Protos and other entity sales teams showing expected sales, targets, leads, and any other information pertaining to sales of recurring services for remote guarding and managed video of NewCBN/ControlByNet services as well as any third party providers (LiveView, RAD or others).

- Category 11: Any e-mails or other communications from NewCBN executives, including but not limited to, emails from Ryan Strange or Paul Ismail, expressing

concerns with the efforts of Protos or NewCBN management and accounting to correct any of the problems that affect the Earnout Payment.[79]

The Buyer produced around 500 documents. The Buyer represented that no responsive documents existed for Categories 4, 8, 9 or 10. The Buyer refused to provide the email correspondence requested in Categories 5, 6, and 11.[80]

The Seller questions the lack of documents responsive to Categories 4, 8, 9 or 10 and claims that the Buyer breached the Information Right by not providing materials responsive to those categories or the emails requested in Categories 5, 6, and 11.

The Buyer argues that the court should interpret the phrase "reasonably necessary" in the category of Verification Information in parallel with how courts interpreted Section 220 of the General Corporation Law before the 2025 overhaul.[81] The Buyer observes that a Section 220 production under the *ancient regime* was "typically limited to formal records unless the party requesting records could demonstrate a need for broader inspection."[82] Under the Section 220 line of cases,

---

[79] *See* Ex. 4 at 3–4.

[80] *See* Ex. 5 at 5.

[81] *See* 85 Del. Laws. Ch. 6, § 2 (2025).

[82] OB at 31 (internal quotation marks and citations omitted).

stockholders could demonstrate a need for a broader inspection by "introduc[ing] evidence indicating that atypical circumstances necessitat[ed it].[83]

When a court interprets a contractual information right, it engages in contract interpretation. The provisions in Section 220 governing stockholder inspection rights reflected a balancing of competing policy interests, now rebalanced after the 2025 amendments. Those policy interests concerned the extent to which a stockholder should be able to access books and records of an entity operating under the direction and control of a board of directors.

A contractual information right does not implicate those policy concerns; it reflects the parties' agreement. The court's job is not to impose a public policy overlay based on a different statutory regime, but to enforce the parties' contract. Moreover, the policies reflected in Section 220 do not translate to an acquisition agreement where the seller has bargained for a contractual right to verify the buyer's earnout calculation. Section 220 caselaw is inapposite.

The Information Right includes the right to obtain Verification Information, defined as information "reasonably necessary to verify any payment owed." The Delaware Supreme Court often looks to dictionaries for assistance in determining plain meaning.[84] Black's Law Dictionary defines "reasonable" as "fair and proper

---

[83] *Okla. Firefighters' Pens. And Ret. Sys. v. Amazon.com, Inc.*, 2022 WL 1760618, at *12 (Del. Ch. June 1, 2022).

[84] *E.g.*, *Andrews v. State*, 34 A.3d 1061, 1063 (Del. 2011) (explaining that when a statute fails to define a term, it "must be given its common, or dictionary, definition"); *Freeman v. X-ray Assocs., P.A.*, 3 A.3d 224, 227–28 (Del. 2010) ("Because

under the circumstances; rational, sound, and sensible" and "necessary" as "needed for some purpose or reason; essential."[85]

Using those definitions, it is reasonably conceivable that the Verification Information could include the information the Seller sought. The word "necessary" imposes a more demanding standard than simple relevance. Likewise, the nouns "records and work papers" suggest a verification right, not broad discovery into motive or operational misconduct. Nevertheless, at the pleading stage, at least some requested materials could have been reasonably necessary as Verification Information, such as billing summaries, invoices, forgiveness and cancellation records, accepted-estimate data, and records concerning third-party services. The Agreement also does not require the Buyer to create records that do not exist, but the underlying transactions support a reasonable inference that responsive records existed and that the Buyer's contrary representation may have been inaccurate.

The Information Right claim therefore survives. The parties can address the necessity and existence of documents on a more developed record.

---

dictionaries are routine reference sources that reasonable persons use to determine the ordinary meaning of words, we often rely on them for assistance in determining the plain meaning of undefined terms." (citations omitted)); *Cephas v. State*, 911 A.2d 799, 801 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms." (citation omitted).

[85] Black's Law Dictionary (12th ed. 2024).

### 3.    The Failure To Comply With The Reasonable Efforts Covenant

The Seller next asserts that the Buyer failed to comply with the Reasonable Efforts Covenant. That covenant required that the Buyer cause the Company to use its "commercially reasonable best efforts" to "retain and keep available the services of its employees" (the "Employee Covenant") and "preserve the goodwill of its customers, suppliers and others having business relations with the company" (the "Goodwill Covenant").[86] The Reasonable Efforts Covenant specifies that it does not "limit[] the business judgment of the Buyer" (the "Business Judgment Qualifier").

The Agreement does not define "commercially reasonable best efforts," which unhelpfully combines the concepts of commercially reasonable efforts and best efforts. "Delaware courts have interpreted commercially reasonable efforts provisions as 'placing an affirmative obligation on the parties to take all reasonable steps' to achieve a particular end."[87] "An efforts clause does not require the identified

---

[86] MIPA § 2.6(b).

[87] *Meyers v. Zimmer Biomet Hldgs., Inc.*, 2026 WL 1194997, at *9 (Del. Ch. May 1, 2026) (quoting *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 273 (Del. 2017) (cleaned up)); *see also see, e.g., Fortis Advisors LLC v. Johnson & Johnson*, — A.3d —, —, 2024 WL 4048060, at *24 (Del. Ch. Sept. 4, 2024) ("Delaware courts have interpreted 'commercially reasonable efforts' clauses as requiring a party 'to take all reasonable steps' toward an end." (citation omitted)), *aff'd in part, rev'd in part and remanded on other grounds*, 352 A.3d 229 (Del. 2026).

outcome."[88] Instead, "it requires parties to try to achieve the identified outcome."[89] Whether the parties have adequately done that depends on context.[90] Generally, when considering whether an efforts clause has been breached, the court looks to whether the party subject to the clause had reasonable grounds to act as it did in attempting to achieve the agreed-upon end.[91] It is reasonably conceivable that the Buyer breached the Reasonable Efforts Covenant by taking steps that breached the Employee Covenant and the Goodwill Covenant.

### a. The Employee Covenant

The Seller contends that the Buyer breached the Employee Covenant by sidelining Strange, transitioning him first from President to Founder and then to a consultant role. The Seller alleges the Buyer took away all of Strange's authority, including his responsibility for customers. The Seller asserts that the Buyer reassigned one of the Company's marketing employees, underpaid and terminated support personnel, and diverted two sales personnel to focusing on administrative work. The Seller also alleges that the Buyer hired an inexperienced sales executive

---

[88] *HControl Hldgs., LLC v. Antin Infrastructure P'rs S.A.S.*, 2023 WL 3698535, at *37 (Del. Ch. May 29, 2023) (citation omitted).

[89] *Id.*

[90] *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *7 n.83 (Del. Ch. Dec. 28, 2018).

[91] *Menn v. ConnMed Corp.*, 2022 WL 2387802, at *35 (Del. Ch. June 30, 2022) (citation omitted).

who generated no sales in 2023. Given Strange's alleged responsibility for most customer relationships and the Buyer's refusal to permit a gradual transition, those allegations support an inference that the Company did not use the required efforts to retain and keep available key employee services.

The Buyer responds that Strange and the marketing employee remained employed and were therefore "retained" and "available." The Buyer also argues that it increased the total number of employees at the Company by hiring a general manager, two new sales executives, two additional salespeople, and an outside operations consultant. Replacement hiring could bear on whether the Company used the requisite efforts, but it does not defeat the claim at the pleading stage. The complaint alleges that the new hires lacked the experience and customer relationships of the displaced personnel.

The Employee Covenant remains an efforts obligation, not an absolute retention guarantee. It does not prohibit every termination or reassignment, guarantee a particular title, or require an employee to remain in an identical function regardless of legitimate business considerations. Here, however, the alleged removal of customer responsibilities from the individual responsible for most of the customer relationships, the rejection of a proposed transition, and the reassignment or loss of other experienced personnel support an inference that the Company did not use commercially reasonably best efforts.

The Employee Covenant claim survives pleading stage review.

### b.    The Goodwill Covenant

The Seller contends that the Buyer breached the Goodwill Covenant by sidelining Strange sending blank invoices to the Company's customers, de-emphasizing customer service, ignoring revenue disruptions, and replacing experienced personnel with inexperienced hires. Those allegations support a reasonable inference that the Company failed to use commercially reasonable best efforts to preserve customer goodwill.

The Buyer characterizes the invoicing problems as ordinary integration issues and argues that the Seller has not identified a customer that terminated its relationship or reduced its business with the Company because of an operational mistake.[92] A plaintiff must plead facts, not evidence. The complaint alleges facts about blank or omitted invoices, forgiven amounts, degraded customer service, and resulting customer departures. Crediting those allegations and drawing reasonable inferences in the Seller's favor supports a claim for breach.

The Buyer also argues in passing that the Company's recurring revenue increased during the Earnout Period compared to the eighteen month period pre-closing.[93] The operative comparison is what the Company would have achieved if the Buyer complied with its contractual obligations. The Goodwill Covenant claim survives.

---

[92] OB at 45.

[93] RB at 21–22.

### c.    The Business Judgment Qualifier

The Buyer appears to rely on the Business Judgment Qualifier by mentioning it in passing. That qualifier cannot defeat the Seller's claim at the pleading stage.

The Business Judgment Qualifier bears directly on whether a breach occurred. An efforts obligation remains cabined by the contractual rights and discretion the parties preserved.[94] The provision protects legitimate, good faith business decisions, including decisions that advance the Buyer's economic interests. It does not permit the Buyer to use its discretion to undermine the objectives that the Reasonable Efforts Covenant identifies. The complaint supports an inference that the challenged actions lacked reasonable grounds and did not represent a good-faith effort toward the contractual objectives. The qualifier therefore does not warrant dismissal.

### 4.    The Failure To Comply With The Negative Covenant

The parties dispute whether the complaint states a claim for breach of the Negative Covenant. It contains two standards. The first prohibits the Buyer and its affiliates from "taking any action which is intended to prevent" the Company from achieving the Earnout Payment (the "Action Clause").[95] The second prohibits the Buyer from taking action that has "the primary effect" of preventing the Company

---

[94] *Vintage Rodeo Parent, LLC v. Rent-a-Center, Inc.*, 2019 WL 1223026, at * 22 (Del. Ch. Mar. 14, 2019).

[95] *See* MIPA § 2.6(b).

from achieving the Earnout Payment (the "Effect Clause").[96] The complaint's detailed allegations plead violations of both clauses.

The Buyer tries to pick off the complaint's allegations one by one. For example, the Buyer argues that adjusting the Company's revenue goal down to the Earnout Threshold suggests a desire to achieve the earnout. Accepting that argument requires another defense-friendly inference. The complaint relies instead on the combined effect of lowering the revenue goal to the Earnout Threshold, sidelining the employee responsible for most customer relationships, deferring 2023 revenue without a legitimate reason, ignoring identified billing and customer-service failures, and changing course after the Earnout Period. Those allegations support a reasonable inference of an intent to prevent the Earnout Payment.

The Buyer also argues that it had no incentive to reduce Recurring Revenue, because more Recurring Revenue would benefit both parties. To the contrary, reducing Recurring Revenue in the short term would benefit the Buyer by reducing or avoiding the earnout.

The Buyer next argues that it had no duty to cross-sell the Company's products. That may be true, but the complaint does not rest on that allegation alone. It alleges a combination of conduct that supports an inference that the Buyer breached the Negative Covenant. Not engaging in cross-selling can be part of that overall picture.

---

[96] *Id.*

36

Next, the Buyer argues that the Seller did not identify which projects the Buyer delayed, which revenue it deferred, or what invoices it forgave. The Seller need not plead at that level of specificity. The complaint gives the Buyer fair notice of the alleged wrong. The parties can develop the facts during discovery.

The Buyer also argues that the complaint only invokes the Action Clause, not the Effect Clause. A complaint need not plead specific legal theories under Court of Chancery Rule 8, and "[t]he court is not bound to analyze the case solely through the counts presented in the pleadings."[97] The original pleading must set forth the essential facts.[98] "So long as claimant alleges facts in his description of a series of events from which [a claim] may reasonably be inferred and makes a specific claim for the relief he hopes to obtain, he need not announce with any greater particularity the precise legal theory he is using."[99]

The complaint alleges that the Buyer's Recurring Revenue figure missed the threshold by $129,225, while a sample of eleven accounts revealed at least $215,000 in omitted revenue. The complaint also alleges deliberate revenue deferral, customer losses, and a change in conduct after the Earnout Period. Those facts support a reasonable inference that preventing the earnout was the primary effect of the challenged actions, even after accounting for legitimate business interests. Whether

[97] *Bamford v. Penfold, L.P.*, 2022 WL 2278867, at \*25 (Del. Ch. June 24, 2022).

[98] *Steiner v. Meyerson*, 1997 WL 349169, at \*5 (Del. Ch. June 13, 1997).

[99] *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979).

the $34,136 adjustment overlaps with the alleged omitted revenue presents a factual issue. Both Negative Covenant theories survive. The complaint's allegations implicate both clauses. The Seller is not required to plead more. The Buyer inferably breached the Negative Covenant.

**5.    The Failure To Include All Qualifying Revenue**

The Buyer and Seller disagree over whether the correct measurement period for calculating Recurring Revenue is the Recurring Revenue Period or the Earnout Period. In calculating Recurring Revenue, the Buyer applied the Recurring Revenue Period, which only includes the calendar year 2023. The Seller argues that the Earnout Period should apply, which would include recurring revenue for the time between closing through the end of 2023. The Seller's argument fails. The definition of Recurring Revenue plainly limits the calculation to the Recurring Revenue Period.

The Buyer first contends that the Seller failed to preserve the measurement-period theory because the Dispute Notice did not identify it. The Agreement required that the Seller identify all points of disagreement. But the court need not resolve that question because the theory fails under the Agreement's unambiguous test.

The Seller fails to plead that the Buyer breached the Agreement by using the Recurring Revenue Period as the measurement window. The Agreement states: "If, during the Earnout Period, the Company achieves the Recurring Revenue [target] . . . then the Seller will be entitled to receive [an earnout] payment . . . ."[100] It defines

---

[100] MIPA § 2.6(a)(i).

the Earnout Period as "the period beginning on the first Business Day following the Closing Date and ending on the close of business on December 31, 2023"[101] and Recurring Revenue as "with respect to the applicable trailing twelve (12) month period through December 31, 2023, revenue of the Company as determined in accordance with GAAP," excluding certain categories.[102] The definition of Recurring Revenue explicitly limits the calculation to the 2023 calendar year, i.e., the Recurring Revenue Period.

The Seller responds that the "twelve-month period" language modifies only the excluded categories of revenue rather than the calculation window. That interpretation would deprive the phrase of its ordinary meaning. The defined term identifies a financial metric measured over a trailing twelve-month period.

The Seller contends that accepting the Recurring Revenue Period as the measurement window renders the Earnout Period meaningless. Not so. Elsewhere in the earnout, the parties designate the Earnout Period as the relevant time frame without defining any additional limitation. For example, the Earnout Covenants apply to the Buyer for the entire Earnout Period. If the parties intended for the Recurring Revenue Period and the Earnout Period to be the same, they would not have specified a narrower time frame.

---

[101] *Id.* Appendix.

[102] *Id.*

The Agreement's plain language therefore makes the Recurring Revenue Period, not the Earnout Period, the proper measurement window. The Buyer used the Recurring Revenue Period in its calculations. The Seller cannot plead a breach on this basis. The Seller has adequately alleged other bases for breach under Counts I and III. Those theories survive.

## B.     Count II: Breach Of The Implied Covenant

Count II asserts that the Buyer breached implied terms of the Agreement by engaging in the same conduct that the Buyer contends violated the Agreement's express terms. The Seller has failed to identify a gap that the implied covenant needs to address. Count II is dismissed.

As a matter of black-letter law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."[103] Delaware likewise recognizes that an implied covenant of good faith and fair dealing "attaches to every contract."[104] The Delaware Supreme Court has summarized the implied covenant concisely as follows:

> The implied covenant is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that . . . neither party anticipated. It applies when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the

---

[103] Restatement (Second) of Contracts § 205 (A.L.I. 1981), Westlaw (database updated Oct. 2024).

[104] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).

asserting party reasonably expected. The reasonable expectations of the contracting parties are assessed at the time of contracting.[105]

While the Delaware Supreme Court has not provided extensive guidance on what "good faith" and "fair dealing" mean, an implied covenant claim is contractual.[106] That means those terms are contractual concepts. When used with the implied covenant, the term "good faith" does not "envision loyalty to the contractual counterparty, but rather faithfulness to the scope, purpose, and terms of the parties' contract."[107] The concept of "fair dealing" similarly refers to "a commitment to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose."[108]

When analyzing an implied covenant claim, a reviewing court does not introduce its own notions of what is "fair or reasonable under the circumstances."[109] The application of "good faith" and "fair dealing" turns "on the contract itself and

---

[105] *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (internal quotation marks omitted).

[106] *Rossdeutscher v. Viacom, Inc.*, 768 A.2d 8, 20 (Del. 2001) ("A breach of the implied covenant is a breach of contract.").

[107] *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 419 (Del. 2013) (emphasis omitted).

[108] *Id.*

[109] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 184 (Del. Ch. 2014).

what the parties would have agreed upon had the issue arisen when they were bargaining originally."[110]

The Delaware Supreme Court has recognized that the implied covenant can apply in two settings: (1) when a party invokes the covenant to imply an omitted right or obligation, and (2) when a party invokes the covenant to constrain a counterparty's exercise of contractual discretion.[111] In the first setting, a court determines whether there is a gap in the contract, whether the gap should be filled, and if so, what term the parties would have agreed to if the issue had arisen at the bargaining table.[112] In the second setting, the discretionary right simplifies the inquiry because it gives rise to the gap. The court need only determine whether the party exercised its discretionary right "reasonably," meaning consistent with the parties' expectations at the time of contracting.[113]

---

[110] *Id.* (emphasis omitted) (internal quotation marks omitted).

[111] *See Johnson & Johnson v. Fortis Advisors LLC*, 352 A.3d 229, 253 (Del. 2026) (explaining the "two primary ways" that the implied covenant operates).

[112] *See Calumet Cap. P'rs LLC v. Victory Park Cap. Advisors, LLC*, 353 A.3d 88, 123–26 (Del. Ch. 2026).

[113]*Gerber*, 67 A.3d at 418 (citing *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440–42 (Del. Ch. 2012), *aff'd in part, rev'd in part on other grounds*, 68 A.3d 665 (Del. 2013)); *see also Calumet Cap. P'rs*, 353 A.3d at 127 ("The principles that govern the implied covenant teach that the exercise of discretionary authority must fall within the range of possibilities that the parties would have agreed to during their original negotiations, if they had thought to address the issue."); *see also Johnson & Johnson*, 352 A.3d at 253 ("When the party exploits that discretion in a manner that defeats the 'overarching purpose' of the bargain, courts may imply a requirement that such discretion be exercised reasonably

### 1.    The Omitted Term Version

The Seller first invokes the omitted term version of the implied covenant. When a party claims that a contract omits a right or obligation, the court "first must engage in the process of contract construction to determine whether there is a gap that needs to be filled."[114] "Through this process, a court determines whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill."[115] The Delaware Supreme Court has emphasized that there must be "genuine contractual silence to the unforeseen development."[116] "[B]ecause the implied covenant is, by definition, *implied*, and because it protects the *spirit* of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue."[117]

---

and in good faith to ensure that the discretionary power is applied consistently with what reasonable parties would have agreed to at signing.").

[114] *El Paso Pipeline*, 113 A.3d at 183.

[115] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at \*16 (Del. Ch. Nov. 17, 2014).

[116] *Johnson & Johnson*, 352 A.3d at 252; *see also Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010) (explaining that the court must determine whether a gap exists because "[t]he implied covenant will not infer language that contradicts a clear exercise of an express contractual right.").

[117] *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at \*10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) (TABLE).

"If a contractual gap exists, then the court must determine whether the implied covenant should be used to supply a term to fill the gap."[118] "Not all gaps should be filled."[119] "When parties could not have realistically addressed a gap—either because of the circumstances they faced or their implicit understandings—then the implied covenant comes into play."[120] "It must be 'clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of had they thought to negotiate with respect to that matter.'"[121]

The Seller has not identified any gaps in the Agreement. The Seller argues that the Buyer breached the implied covenant by disregarding the agreed-upon process for reporting, calculating, and making the Earnout Payment. The Agreement expressly covers those points.

The Seller next argues that the Buyer breached the implied covenant by failing to "cooperate." The Seller argues that "the text and structure of Section 2.6 implies a level of mutual cooperation in order to narrow and clarify the disputes related to the calculation of the Earnout Payment" and views the Buyer's conduct as "a continued

---

[118] *El Paso Pipeline*, 113 A.3d at 183.

[119] *Id.*

[120] *Calumet Cap. P'rs LLC v. Victory Park Cap. Advisors, LLC*, 353 A.3d at 125.

[121] *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010) (quoting *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (cleaned up)).

pattern of obstruction . . . ."[122] This is precisely the kind of "free-floating duty" the implied covenant will not supply.[123]

### 2. The Discretionary Version

The Seller also invokes the discretionary version of the implied covenant. The Seller argues that the Buyer had discretion to operate the Company yet could not to do so in a manner that deprived the Company of the human resources necessary to achieve the Earnout Payment. The Seller also argues that the Buyer had an implied obligation to properly account for Recurring Revenue.

The Agreement recognizes that the Buyer retained post-closing operational discretion. But the Agreement expressly regulates that discretion through the commercially reasonable best efforts standard, the good-faith requirement, the Business Judgment Qualifier, and the Negative Covenant. Those provisions supply the governing standards and leave no contractual gap for the implied covenant to fill.

The Seller therefore fails to plead a breach of the implied covenant of good faith and fair dealing under the discretionary version.

---

[122] AB at 40.

[123] *El Paso Pipeline*, 113 A.3d at 182–83 (the implied covenant may not be invoked to "establish a free-floating requirement that a party act in some morally commendable sense.").

## IV.    CONCLUSION

The Buyer's motions to dismiss under Rule 12(b)(1) and 12(b)(3) are denied. The Buyer's Rule 12(b)(6) motion is granted as to Count II and to the extent set forth in this opinion. Otherwise, it is denied.